IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| INTERSTATE BLOOD BANK, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action |
| ) | No. 2:17-cv-02229 |
| ALLIED WORLD SURPLUS LINES ) | **(JURY DEMANDED)** |
| INSURANCE COMPANY ) | |
| ) | |
| Defendant ) | |
| ) | |

**COMPLAINT FOR BREACH OF CONTRACT
AND BAD FAITH REFUSAL TO HONOR INSURANCE OBLIGATIONS**

COMES NOW, the Plaintiff, Interstate Blood Bank, Inc. ("IBBI"), by and through undersigned counsel and for its cause of action against Allied World Surplus Lines Insurance Company ("Allied World") states as follows:

**THE PARTIES/JURISDITION/VENUE**

1. IBBI is a corporation organized under the laws of the State of Tennessee with its principal offices located at 5700 Pleasant View Road, Memphis, TN. Pertinent to this dispute, IBBI operates a number of paid donor collection centers. Unlike the not for profit operations such as Life Blood, the products (in this case, plasma) drawn from donors, is not used for direct transfusion. Instead, the plasma is drawn, immediately frozen and sold to manufacturers that process the plasma into a number of constituent components (or, contract with a third-party processor) and sell the resulting products for further medical uses.

2. Allied World is a New Hampshire Corporation with its principal place of business located at 199 Water Street, New York, NY 10038. Allied (or its predecessor in interest) has been licensed to write insurance in Tennessee continuously since at least 1998.

3. This court has subject matter jurisdiction in that the dispute is between citizens of different states and the amount in controversy exceeds the jurisdictional limit. Allied World is subject to personal jurisdiction in Tennessee as it is authorized to do business in Tennessee and has transacted business here. Venue is proper in this district inasmuch as Allied delivered the insurance policy at issue here; a substantial portion of the events giving rise to the claim occurred here and IBBI suffered damage in this district.

## FACTS COMMON TO ALL COUNTS

4. On or about May 1, 2015, Allied World issued its policy No 0305-5536 (on Darwin Select Insurance Company), providing, among other things, General Liability coverage for IBBI and its affiliates. The policy is a "claims made" policy. A copy of the policy is attached hereto as Exhibit A.

5. On or about January 27, 2015, IBBI shipped approximately 2,000 units of frozen plasma to KEDPlasma, LLC. KEDPlasma intended to have the plasma processed or "fractionated" in order to produce derivative products for sale to its customers. Title to the plasma passed to KedPlasma at IBBI's shipping dock.

6. Mistakenly included with the shipment were two (2) units that were contaminated with parvovirus B19. The mistake occurred because both units were incorrectly labeled "negative" for contaminants. Therefore, at the time of shipping and upon receipt by KEDPlasma, the units appeared to have been appropriately included with the shipment.

7. The plasma was shipped frozen and stored by KEDPlasma at the fractionator's facility in a frozen condition until it was to be processed. On April 1, 2015, the plasma was thawed, placed into a production container and blended. It was at this point that the contaminated units were unknowingly mixed with a batch of plasma, made from otherwise "clean" units. Before samples were taken for testing, Cryoprecipitate AHF (the clotting factor) was removed from the batch. After samples were collected, the manufacturer added buffer to adjust the ph of the pool and then the remaining factors were removed from the batch and collected. Before the contamination was discovered, all the intermediate products had not only been removed from the batch, but also placed into containers and frozen. The full fractionation process took about ten (10) days. It was not until April 12, 2015 that KEDPlasma received the first test results showing positive for Parvo B19. By then, the fractionation process had been completed.

8. Upon discovering the contamination, KEDPlasma was required to destroy the fractionated products and the fractionator (Grifols Worldwide Operations, LTD) was required to cleanse the manufacturing equipment of all traces of the contaminated plasma. It cost $67,418.49 to clean the equipment. KED Plasma reimbursed the fractionator for the cost of cleaning the equipment.

9. On or about May 29, 2015, KEDPlasma made demand on IBBI for damages suffered because of IBBI's alleged negligence in shipping two units of plasma incorrectly labeled "negative" that, in fact, were contaminated. The contaminated plasma, in turn, contaminated an entire pool of plasma as well as the products produced from the contaminated pool. KEDPlasma demanded payment in the amount of $365,033.39 to cover both the contamination of the pool, the resulting products and the remediation of the polluted manufacturing equipment ("Claim").

10. With Allied's permission, IBBI paid KEDPlasma the full amount of the Claim.

11. By its letter dated December 22, 2015, Allied World denied coverage for any portion of the Claim. This blanket denial was confirmed by Allied World's counsel, Troutman Sanders, in a letter dated February 18, 2016.

12. Shortly, thereafter, Allied World revised it position concerning coverage for the equipment clean-up and issued its check for the full amount of the cleanup cost, less a portion of the policy retention.

13. Allied World persists in denying coverage on the largest portion of the Claim in the amount of $297,610.47.

## COUNT I:  BREACH OF CONTRACT

14. IBBI hereby incorporates the allegations of paragraphs 1 to 13 as if incorporated verbatim herein.

15. Among the covering agreements set forth in Exhibit A is Claims-Made General Liability.

16. This is designed to provide coverage for any Claim against IBBI for Property Damage caused by an Occurrence.

    a. "Property Damage" includes

        i. Physical injury to or destruction of tangible property, including all loss of use thereof as a result of such physical injury or destruction; or

        ii. Loss of use of property that is not physically injured.

    b. As pertinent to this dispute, an "Occurrence" is defined as an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in injury neither expected nor intended by the Insured.

17. In this instance, KEDPlasma asserted a Claim against IBBI for injury leading to the destruction of its pool of plasma and the resulting fractionated products as well as the

4

contamination to the fractionation equipment. The injury resulted from the introduction of two (2) units of contaminated plasma (that IBBI accidently labeled as "negative" and inadvertently shipped to KEDPlasma) into a pool of otherwise "clean" plasma. This injury was neither expected nor intended by IBBI.

18.     Allied World's failure and refusal to cover the KEDPlasma Claim and reimburse IBBI in the full amount of the Claim (less the retention) is a breach of contract, for which default, Allied World is fully liable.

### COUNT II: BAD FAITH REFUSAL TO PROVIDE COVERAGE

19.     IBBI hereby incorporates the allegations of paragraphs 1 to 18 as if incorporated verbatim herein.

20.     IBBI tendered the KEDPlasma Claim to Allied World on or about May 20, 2015.

21.     In July, 2015, Allied World retained defense counsel located in Chattanooga, Tennessee even though IBBI's corporate headquarters, its decision makers and all the evidence in IBBI's possession was in Memphis, TN.

22.     Typically, upon receipt of a claim, a carrier will undertake a coverage analysis. If the carrier has any uncertainty that a reported claim is covered, it will advise the insured in writing that it will accept the defense of the claim, while also reserving its rights to deny coverage if future developments warrant. This writing is known in the industry as a "reservation of rights" letter. Neither at the time it received notice of the Claim; nor at the time Allied World retained defense counsel; nor at any time thereafter, did Allied World issue a "reservation of rights" letter.

23.     Accordingly, IBBI assumed that Allied World had accepted coverage. This assumption was confirmed in an email from defense counsel dated November 5, 2015, in which he stated that

he had spoken with Allied World's claims representative and that it was his understanding that Allied World had accepted responsibility for the loss of the contaminated plasma.

24. During a conference call held on November 12, 2015 and attended by, among others, Chattanooga, TN defense counsel, Mr. Stephen Moss, an IBBI Vice President and Allied World's internal adjuster, Ms. Sandra Bevins, Ms. Bevins advised the group that Allied World should be ready to pay for the loss of the contaminated plasma and she was willing to recommend that IBBI and Allied World share 50/50 in the portion of the Claim relating to the contaminated equipment.

25. Based on Ms. Bevins' assurance that Allied would honor at least the largest portion of the claim, Chattanooga counsel circulated a draft settlement agreement to be entered into between IBBI and KEDPlasma.

26. Unknown to IBBI, on November 12, 2015 (the same day as the conference call during which Ms. Bevins assured the participants that there would be coverage), Allied World retained the law firm Troutman Sanders in Washington, D,C. to determine a basis on which to deny the Claim. On December 22, 2015, Allied World issued its letter denying any coverage for the Claim. This letter was preceded by a phone call to IBBI's Memphis-based insurance broker informing him that Allied World had done an about face on the issue of coverage.

27. Allied World's abrupt change of position was particularly troublesome because IBBI had been reassuring its customer, KEDPlasma that if it remained patient, the matter would soon be resolved without the need for any litigation.

28. As KEDPlasma was one of IBBI's largest customers for plasma, it was extremely important for IBBI to maintain KEDPlasma's good will.

29. At all times pertinent to this dispute, T.C.A. §5-7-105(a) provided that:

6

> The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest on the bond, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided, further, that the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

30. Allied World's denial of coverage has been in "bad faith" within the meaning of T.C.A. §5-7-105(a). Allied World does not dispute that IBBI's negligence resulted in the damage. Instead, the carrier relies on two exclusions in the policy:

   a. That it does not cover damage to the Insured's "own product;" and

   b. That the policy does not cover the "refund" of amounts "allegedly wrongfully held or retained by an Insured."

31. As to the first exclusion for damage to the Insured's "own product," the damage from the inadvertent shipment of two units of mislabeled plasma was to both the pool of plasma and the products refined from it. The industry recognizes that the pool of plasma is a different product, separate and distinct from the individual units of plasma that compromise the pool. The same analysis applies to the products derived from the contaminated pool; that is that the fractionated products are distinct from both the individual units of plasma and the pool.

32. There is no logical distinction between the damage to the contaminated equipment -the portion that Allied World ultimately honored- and the damage to the pool of plasma – the (largest)

portion of the Claim that Allied World has denied.  In both situations, there was damage to a third party's product resulting directly from IBBI's inadvertent shipment of two mislabeled units.

33. As to the second exclusion, the Claim was not for the refund of anything, much less money allegedly wrongfully retained, instead KEDPlasma sought to be compensated for the loss of the plasma pool as well as the money that it reimbursed the fractionator to cleanse the equipment.

34. Far more than sixty (60) days have elapsed since IBBI made demand on Allied World that it honor the totality of the Claim.

35. IBBI has suffered additional loss, expense and injury because of Allied World's bad faith denial of the claim, including, but not limited to the loss of KEDPlasma's goodwill and its attorneys' fees in pursuing this action to recover on the policy.

## PRAVYER FOR RELIEF

Based on the allegations contained in Paragraphs 1 – 35 above, IBBI respectfully prays:

1. That a jury be empaneled to try this action;
2. That it be awarded damages for breach of contract in the amount of $297,610.47.
3. That it be awarded damages under T.C.A. §5-7-105(a) n the amount of $74,402.62
4. That it be awarded such other, further general and/or special relief to which it may become entitled.

Respectfully submitted,

/S/ Earle J. Schwarz (#07192)
THE OFFICES OF EARLE J. SCHWARZ
2157 Madison Ave. Suite 201
Memphis, TN  38104
eschwarz@earle-schwarz.com

8